EXHIBIT B

**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
stevem@knightlaw.com
Amy Morse (SBN 290502)
amym@knightlaw.com
10250 Constellation Blvd., Suite 2500
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiffs,
JULIE DAWN CORDARO and
JENNIFER A. CORDARO

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**07/16/2018** at 11:08:57 AM

Clerk of the Superior Court
By Yvette Mapula, Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN DIEGO

| | |
|---|---|
| JULIE DAWN CORDARO and JENNIFER A. CORDARO, <br><br> Plaintiffs, <br><br> vs. <br><br> FORD MOTOR COMPANY, a Delaware Corporation; VINCE DIXON FORD, INC., a California Corporation, dba KEN GRODY FORD; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: 37-2018-00035179-CU-BC-CTL <br><br> Unlimited Jurisdiction <br><br> **COMPLAINT FOR:** <br><br> 1. **BREACH OF EXPRESS WARRANTY – VIOLATION OF SONG-BEVERLY ACT** <br> 2. **BREACH OF IMPLIED WARRANTY – VIOLATION OF SONG-BEVERLY ACT** <br> 3. **FRAUDULENT INDUCEMENT – CONCEALMENT** <br> 4. **FRAUDULENT INDUCEMENT – INTENTIONAL MISREPRESENTATION** <br> 5. **FRADULENT INDUCEMENT – NEGLIGENT MISREPRESENTATION** <br><br> *Assigned for All Purposes to the Honorable* <br><br> Department |

-1-

1    Plaintiffs JULIE DAWN CORDARO and JENNIFER A. CORDARO (hereinafter
2    "Plaintiffs") allege as follows against Defendants, FORD MOTOR COMPANY, a Delaware
3    Corporation (hereinafter "FORD"); VINCE DIXON FORD, INC., a a California Corporation, dba
4    KEN GRODY FORD, (hereinafter "KEN GRODY FORD"); and DOES 1 through 10 inclusive, on
5    information and belief, formed after an inquiry reasonable under the circumstances:

6
7                              **DEMAND FOR JURY TRIAL**

8    1.    Plaintiffs JULIE DAWN CORDARO and JENNIFER A. CORDARO hereby demand
9    trial by jury in this action.

10
11                            **GENERAL ALLEGATIONS**

12   2.    Plaintiffs JULIE DAWN CORDARO and JENNIFER A. CORDARO are individuals
13   residing in the City of Oceanside, County of San Diego, and State of California.

14   3.    Defendant FORD is and was a Delaware Corporation registered to do business in the
15   State of California with its registered office in the City of Los Angeles, County of Los Angeles, and
16   State of California.

17   4.    Defendant KEN GRODY FORD is and at all relevant times was a California Corporation
18   registered to do business in the State of California, with its principal place of business in the City of
19   Carlsbad, County of San Diego, and State of California, and its registered agent for service of process
20   in the City of Buena Park, County of Orange, and State of California.

21   5.    This cause of action arises out of the warranty obligations of Ford Motor Company for a
22   vehicle purchased by Plaintiffs and for which Ford Motor Company issued a written warranty.
23   Plaintiffs also allege that Ford concealed a known defect from Plaintiffs. The defective component
24   is called the DPS6 PowerShift Transmission (Hereinafter "PowerShift Transmission").   The
25   PowerShift Transmission is an "automated manual" transmission used by Ford in their 2011-2013
26   Ford Fiesta vehicles and 2012-2014 Ford Focus vehicles. Ford also misrepresented to Plaintiffs the
27   type of transmission the PowerShift transmission is/was.

28   ///

1    6.     Plaintiffs do not know the true names and capacities, whether corporate, partnership,

2    associate, individual or otherwise of Defendant issued herein as Does 1 through 10, inclusive, under

3    the provisions of section 474 of the California Code of Civil Procedure.  Defendant Does 1 through

4    10, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth

5    herein, and are legally liable to Plaintiffs.  Plaintiffs will seek leave to amend this Complaint to set

6    forth the true names and capacities of the fictitiously named Defendant, together with appropriate

7    charging allegations, when ascertained.

8    7.     All acts of corporate employees as alleged were authorized or ratified by an officer,

9    director or managing agent of the corporate employer.

10    8.     Each Defendant whether actually or fictitiously named herein, was the principal, agent

11    (actual or ostensible), or employee of each other Defendant and in acting as such principal or within

12    the course and scope of such employment or agency, took some part in the acts and omissions

13    hereinafter set forth by reason of which each Defendant is liable to Plaintiffs for the relief prayed for

14    herein.

15    9.     On October 1, 2011, Plaintiffs purchased a new 2012 Ford Focus, VIN:

16    1FAHP3K24CL244175, (hereinafter "the Vehicle" or "Subject Vehicle"), and express warranties

17    accompanied the sale of the vehicle to Plaintiffs by which Ford Motor Company undertook to

18    preserve or maintain the utility or performance of Plaintiffs' vehicle or provide compensation if there

19    was a failure in such utility or performance. The sales contract is attached and incorporated by its

20    reference as Exhibit 1.

21    10.    The vehicle was delivered to Plaintiffs with serious defects and nonconformities to

22    warranty and developed other serious defects and nonconformities to warranty including, but not

23    limited to, transmission issues.

24    11.    Plaintiffs hereby revoke acceptance of the sales contract.

25    12.    Plaintiffs hereby demand trial by jury in this action.

26    ///

27    ///

28    ///

-3-

Cordaro v. Ford - COMPLAINT

**The DPS6 PowerShift Transmission Defect**

13.     The Vehicle was manufactured by Ford and delivered to Plaintiffs with a PowerShift Transmission.   Ford offered the PowerShift Transmission as the sole "automatic transmission" option in the Subject Vehicle.

14.     The PowerShift Transmission is neither a traditional manual transmission, nor a typical automatic transmission, but is a computerized "automated manual" transmission.

15.     Traditional manual transmissions use a driver-controlled clutch.   By pressing and releasing a foot pedal, the driver causes the clutch to mechanically engage and disengage the engine from the transmission, allowing the vehicle to travel continuously while the driver manually changes gears. Because a clutch allows for transfer of virtually all of the engine's power to the transmission, a properly designed and operating manual transmission is highly efficient. However, operation of a manual transmission can be difficult for less experienced drivers, and can result in the vehicle jerking or shuddering during improper operation, manual transmissions are disfavored by some consumers.

16.     In contrast, typical automatic transmissions free the driver from operating the clutch through the use of a fluid-filled device called a torque converter.   The torque converter substitutes for the manual transmission's clutch, transmitting power from the engine to the transmission through a fluid medium.

17.     While automatic transmissions offer increased comfort and convenience, they are generally less fuel efficient and slower-shifting than manual transmissions because the torque converter transfers power through fluid less efficiently than a mechanical clutch.

18.     Ford marketed and sold its PowerShift Transmission as an automatic transmission that offered the "best of both worlds" combining a manual transmission's fuel economy with an automatic transmission's ease of operation and shift quality.

19.     Ford's PowerShift Transmission, while sometimes referred to as an automatic, is actually a set of computerized manual transmissions.  It lacks a torque converter, instead using two clutches to mechanically engage and disengage the engine and transmission.   Whereas similar "automated manual" transmissions on the market use "wet" clutches bathed in oil, Ford's PowerShift Transmission clutches lack the oil pumps and other components of a wet clutch system, and instead

1  operate "dry."

2      20.   Ford designed the PowerShift Transmission in an effort to meet heightened governmental
3  and consumer expectations for fuel economy, performance, convenience, and efficiency.  Ford
4  designed and marketed its PowerShift Transmission as a more advanced and fuel efficient automatic
5  transmission.  According to Ford's press release dated March 10, 2010, "PowerShift with dry-clutch
6  facings and new energy-saving electromechanical actuation for clutches and gear shifts saves
7  weight, improves efficiency, increases smoothness, adds durability and is sealed with low-friction
8  gear lubricant for the life of the vehicle.  The transmission requires no regular maintenance."

9      21.   In theory, a computer-controlled, automated manual transmission may provide the
10  convenience of an automatic transmission without sacrificing the fuel efficiency and shift speed of
11  a manual transmission.  In practice, however, Ford's PowerShift Transmission is plagued by
12  numerous problems and safety concerns.

13      22.   Plaintiffs are informed and believe, and based thereon allege, that the PowerShift
14  Transmission is defective in its design and/or manufacture in that, among other problems, the
15  transmission consistently slips, bucks, kicks, jerks, harshly engages, has premature internal wear,
16  sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, and,
17  eventually, premature transmission failure (the "Transmission Defect").

18      23.   The Transmission Defect causes unsafe conditions in vehicles equipped with the
19  PowerShift Transmission, including, but not limited to suddenly lurching forward, delayed
20  acceleration, and sudden loss of forward propulsion.  These conditions present a safety hazard
21  because they severely affect the driver's ability to control the car's speed, acceleration, and
22  deceleration.  For example, these conditions make it difficult to safely merge into traffic.  Even more
23  troubling, the Transmission Defect can cause the vehicle to fail to downshift and decelerate, but
24  instead continue to transfer power to the transmission and even surge the engine's RPMs, when the
25  brakes are depressed.  As a result, drivers of vehicles equipped with the PowerShift Transmission
26  have reported their vehicles lurching forward into intersections at red lights due to the failure of their
27  braking efforts to stop the car.

28  ///

24.     On information and belief, the Transmission Defect also causes premature wear to the PowerShift Transmission's clutch plates and other components, which results in premature transmission failure and requires expensive repairs, including premature transmission replacement.

25.     As early as 2010, Ford knew or should have known that the PowerShift Transmission contained one or more design and/or manufacturing defects that negatively affect drivability and cause safety hazards.

26.     Plaintiffs are informed and believe, and based thereon allege, that prior to sale of the Vehicle, Ford knew, or should have known, about the Transmission Defect through its exclusive knowledge of non-public, internal data about the Transmission Defect, including: pre-releasing testing data; early consumer complaints about the Transmission Defect to Ford's dealers who are Ford's agents for vehicle repairs; dealership repair orders; testing conducted in response to those complaints; technical service bulletins ("TSBs") developed by Ford and communicated to its dealers and authorized repair facilities; the existence of substantially identical defects in substantially identical European and Australian model vehicles released prior to Ford's marketing and sale of the PowerShift Transmission domestically; and other internal sources of information possessed exclusively by Ford and its agents. Nevertheless, Ford and its agents have actively concealed the Transmission Defect, and failed to disclose this defect to Plaintiffs at the time of purchase of the Vehicle or thereafter.

27.     Before offering vehicles equipped with the PowerShift Transmission (which Ford internally refers to as the "DPS6 automatic transmission") in the United States, Ford offered substantially identical vehicles, equipped with a similar dual-clutch transmission, in Europe and Australia. Although the domestic version of the transmission utilizes dry clutches as opposed to the European and Australian version's wet clutches, Ford acknowledges that the transmission offered for sale in the United States is "derivative" of the design from the European and Australian models. European and Australian versions of the dual-clutch transmission suffered from similar defects known to Ford as alleged herein.

28.     In addition to obtaining years of feedback and testing from its European and Australian dual-clutch transmission, according to Ford, its team:

> "logged approximately three years or 6,000 man-hours of computer aided mathematical modeling, simulation and analysis of engine speeds, torque and clutch capacity in only 24 months real time to prove the THF concept was production ready."

29.   In addition, Ford boasted about its extensive testing of the vehicle in its marketing brochures that were publicly distributed:

> "Obsessive was the starting point. You'll enjoy every drive because Focus engineers obsessed over every last detail. Focus was thoroughly tested in an assortment of harsh environments and situations to make sure you get a car beyond your wildest imagination."

30.   The PowerShift Transmission uses a program called Torque Hole Filling ("THF"), which is a combination of computer algorithms and computer aided tools to fill the torque hole, or what is more commonly perceived as a hesitation, while shifting. Ford claimed its THF technology would create a smoother driving experience for the customer to promote sales.

31.   Despite these claims, consumers have not experienced a smoother driving experience from THF or any other technology incorporated in the PowerShift Transmission. Multiple reviews in automotive journals and customer complaints have documented and confirmed that the PowerShift transmission has continuously exhibited the defects, malfunctions, maladjustments, and nonconformities that the Plaintiffs now complain of.

32.   In a 2011 *New York Times* review of the Ford Focus, the reviewer stated that "Ford programmed the PowerShift Dual-clutch transmission to change gears in odd and infuriating ways" and that "[t]he transmission is often in the wrong gear at the wrong time, resulting in jerks, pauses and lethargic acceleration."

33.   In response to these criticisms, Greg Burgess, an engineer at Ford, conceded in the same *New York Times* article that "[i]t is quite a challenge to deliver something that is very, very fuel efficient and yet feels like a conventional automatic, and there are some balances and some trade-offs that we make."

34.   In response to complaints about the Transmission Defect, in 2010 and 2011, Ford issued several Technical Service Bulletins ("TSBs") to its dealers and authorized repair facilities acknowledging defects in the PowerShift Transmission. Ford's TSB from September 2010, covering

1  the 2011 Ford Fiesta, informed dealers and service personnel of "concerns such as no engagement
2  or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse,
3  grinding noise during engagement, and/or check engine light with transmission control module (CM)
4  diagnostic trouble code..."

5      35.     Similarly, Ford's TSB released on January 1, 2011, covering the 2011 Ford Fiesta with
6  the PowerShift Transmission, informs dealers and service personnel of problems with the
7  PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response
8  while driving."

9      36.     Ford's TSB from March 31, 2011 also covering the 2011 Ford Fiesta, informs dealers of
10  problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

11      37.     Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta. These TSBs
12  addressed problems with the PowerShift Transmission including "concerns in Drive or Reverse
13  when shifting from Park to Drive or reverse, no engagement, delayed engagement, intermittent
14  engagement, noise during engagement..."

15      38.     Another Ford TSB released in September 2011 advised dealers to reprogram the
16  transmission computer if 2011 Ford Fiesta owners complained about "hesitation when accelerating
17  from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in
18  or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

19      39.     The 2012 Ford Focus was the subject of a September 2011 Ford TSB, which informed
20  dealers and service personnel of transmission problems including: "RPM flare on deceleration
21  coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations
22  at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift..."

23      40.     In May of 2012, Ford issued a "Customer Satisfaction Program: Program Number
24  12B37." In a letter sent to 2012 Ford Focus drivers, Ford indicated that drivers "may experience
25  rough or jerky automatic transmission shifts. In addition, the vehicle may experience roll back when
26  the driver is transitioning from the brake pedal to the accelerator pedal while on a slight incline."
27  Significantly, Ford did not issue a recall and did not warn drivers of the safety risks associated with
28  these known problems.

41.     Because Ford will not notify the public that the transmission is defective, Plaintiffs (as well as members of the general public) are subjected to dangerous driving conditions that often occur without warning.

42.     Ford knew about, and concealed, the Transmission Defect present in the Vehicle, along with the Transmission Defect's attendant dangerous safety and drivability problems, from Plaintiffs at the time of sale, repair, and thereafter.  In fact, instead of repairing the defects in the PowerShift Transmission, Ford either refused to acknowledge their existence, or performed superficial and ineffectual software upgrades that simply masked the symptoms of the Transmission Defect.

43.     If Plaintiffs knew about these defects at the time of sale, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

44.     As a result of Plaintiffs' reliance on Ford and its agent's omissions and/or misrepresentations, Plaintiffs suffered an ascertainable loss of money, property, and value to the Vehicle.  Additionally, as a result of the Transmission Defect, Plaintiffs were harmed and suffered actual damages in that the Vehicle's transmission is substantially certain to fail before its expected useful life has run.

### Ford Had Exclusive Knowledge of the Transmission Defect

45.     Ford had superior and exclusive knowledge of the Transmission Defect, and knew or should have known that the Transmission Defect was not known or reasonably discoverable by Plaintiffs, before Plaintiffs purchased the Vehicle.

46.     Plaintiffs are informed and believe and based thereon allege that before Plaintiffs purchased the Vehicle, and since at least 2010, Ford knew about the Transmission Defect through sources not available to consumers, including pre-release testing data, early consumer complaints about the transmission defects to Ford and its dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data, aggregate data from Ford dealers, among other internal sources of aggregate information about the problem including, but not limited to, similar defects in the substantially identical European and Australian models.

47.     Before the Vehicle was available for sale in the United States, Ford offered the same vehicles, equipped with a similar dual-clutch transmission, in Europe and Australia.  Although the

1 United States version utilizes dry-clutches as opposed to the European and Australian version's wet-
2 clutches, Ford acknowledged in its own press release that the transmission offered for sale in the
3 United States is a "derivative" of the design of the European and Australian models. European and
4 Australian versions of the dual-clutch transmission suffered from similar defects as alleged herein.

5     48.    In addition to having access to years of analysis and feedback concerning the prior dual-
6 clutch design, Ford also acknowledged in its own press releases the extensive pre-release testing and
7 computer aided modeling, simulation, and analysis it conducted before bringing the PowerShift
8 Transmission to the United States market.

9     49.    Ford was also aware of the Transmission Defect through the numerous complaints it
10 received, both from consumers and from automotive journalists, who roundly criticized the
11 performance of the PowerShift Transmission. Indeed, a July 15, 2011 *New York Times* review of
12 the Ford Focus criticized the PowerShift transmission's "jerks, pauses and lethargic acceleration."
13 In that same article, Greg Burgess, a Ford engineer, admitted that Ford made "tradeoffs" in terms of
14 drivability in order to "deliver something that is very, very fuel efficient."

15     50.    The review went on to state: "the logical explanation is that they [the Ford Engineers]
16 were given a fuel economy target and no option but to meet it. One might wonder why a top
17 executive didn't step in to keep the transmission from reaching market."

18     51.    The existence of the Transmission Defect is a material fact that a reasonable consumer
19 would consider when deciding whether to purchase or lease a vehicle equipped with a PowerShift
20 Transmission. Had Plaintiffs known that the Vehicle was equipped with a defective transmission,
21 they would not have purchased the Vehicle equipped with the PowerShift Transmission or would
22 have paid substantially less for it.

23     52.    Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's transmission is
24 safe, will function in a manner that will not pose a safety hazard, and is free from defects. Plaintiffs
25 further reasonably expect that Ford will not sell or lease vehicles with known safety defects, such as
26 the Transmission Defect, and will disclose any such defects to its consumers when it learns of them.
27 They did not expect Ford to fail to disclose the Transmission Defect to them and to continually deny
28 the defect.

**Ford's Failure to Disclose the PowerShift Transmission Defect**

53.     Ford has never disclosed the PowerShift Transmission defect to Plaintiffs prior to the purchase of the Subject Vehicle or at any point during ownership of the Subject Vehicle, and Ford has never instructed its dealerships to disclose the PowerShift Transmission defect to drivers or potential purchasers or lessees of vehicles equipped with the PowerShift Transmission.

54.     The PowerShift Transmission defect was not known or reasonably discoverable by the Plaintiffs before purchase or lease, or without experiencing the defect first hand and exposing themselves to an unreasonable safety risk.

55.     Ford has remained silent even as it issued service bulletins, conducted internal investigations, and witnessed the failure of the transmission in earlier models of their vehicles distributed in Europe and Australia.

56.     Ford's refusal to publically acknowledge the defect has created widespread confusion. Ford's failure to notify consumers, dealerships, or auto-technicians prevents the PowerShift Transmission problem from being efficiently diagnosed. Drivers are led to believe that the problems they are experiencing with the transmission in their vehicle are actually "normal characteristics" of the transmission. Likewise, the lack of information makes it less likely that dealerships and auto-technicians will be able to diagnose and fix the PowerShift Transmission defect, or advise Plaintiffs about the dangers of driving the Subject Vehicle.

57.     As a result of Ford's inaction and silence, Plaintiffs were entirely unaware that Plaintiffs purchased, and continue to drive, an unsafe and unreliable vehicle. As Ford knows, a reasonable person would consider the PowerShift Transmission defect important and would not purchase or lease a vehicle equipped with the PowerShift Transmission defect were the defect disclosed in advance, or would pay substantially less for the vehicle.

**Ford Has Actively Concealed the Transmission Defect**

58.     While Ford has been fully aware of the Transmission Defect affecting the Vehicle, Ford and its agents actively concealed the existence and nature of the Transmission Defect from Plaintiffs at the time of purchase, repair, and thereafter.  Specifically, Ford failed to disclose or actively concealed, at and after the time of purchase or repair:

a.  any and all known material defects or material nonconformity of the Vehicle, including the defects relating to the PowerShift Transmission;

b.  that the Subject Vehicles, including their PowerShift Transmission, were not in good working order, were defective, and were not fit for the intended purposes; and

c.  that Subject Vehicles and their PowerShift Transmission were defective, despite the fact that Ford learned of such defects through alarming failure rates, customer complaints, as well as through other internal sources, as early as 2010.

59.     As a result of the Transmission Defect, Ford was inundated with complaints regarding the PowerShift Transmission. In July 2011, Ford implemented a communications strategy intended to enlighten consumers about some of the behavior characteristics of the PowerShift Transmission in order to "improve customer expectations." In a memo with instructions sent to Ford dealers and service personnel, which Ford intended its dealers and service personnel to communicate to consumers, Ford noted that some of the common and normal characteristics of the PowerShift Transmission include double clicking metal sounds, coast down whine, low speed grinding, and reverse gear whine.

60.     However, despite Ford's public insistence that these behavioral characteristics of the PowerShift Transmission were normal, in 2010 and 2011, Ford issued several TSBs to its dealers in the United States acknowledging defects in the PowerShift Transmission. Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informs dealers how to address and attempt to repair the PowerShift Transmission in response to "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or a check engine light with transmission control module (TCM) diagnostic trouble code..."

61.     Ford's TSB released on January 1, 2011, covering the 2011 Fiesta with the PowerShift Transmission, informs dealers of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

62.     Ford's TSB from March 31, 2011, also covering the 2011 Ford Fiesta, informs dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

63.     Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta.  These TSBs addressed problems with the PowerShift Transmission including "concerns in Drive or Reverse when shifting from Park to Drive or reverse, no engagement, delayed engagement, intermittent engagement, noise during engagement..."

64.     On information and belief, another Ford TSB released in September 2011 advised dealers to reprogram the transmission computer if 2011 Fiesta owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

65.     The 2012 Ford Focus was the subject of a Ford TSB in September 2011, which informed dealers of transmission problems including: "RPM flare on deceleration coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift..."

66.     In December of 2011, *Motor Trend* magazine called these efforts by Ford a "stealth upgrade" and noted that while "[t]here's no official recall or service campaign... anybody who complains or requests an upgrade at the dealership can have their powertrain control computer re-flashed."

67.     On information and belief, the software upgrades recommended and encouraged by the various TSBs issued by Ford were completely ineffective at addressing the Transmission Defect.

68.     When consumers present vehicles equipped with the PowerShift Transmission to an authorized Ford dealer for repair to the transmission, rather than inform consumers of the Transmission Defect or conclusively repair the problem under warranty, Ford's dealers and authorized repair facilities either inform consumers that their vehicles are functioning properly, or perform superficial and ineffectual software updates that delay or mask the manifestation of the Transmission Defect in an attempt to avoid more comprehensive and expensive repairs or replacements under the warranty.

69.     To this day, Ford still has not notified Plaintiffs that the Vehicle suffers from a systemic defect that causes the transmission to malfunction.

///

**PLAINTIFFS' EXPERIENCES**

70.     The Vehicle was equipped with a DPS6 Ford PowerShift Transmission.

71.     On or about October 1, 2011, Plaintiffs visited Ken Grody Ford in Carlsbad, California in hopes of purchasing a new Ford Focus vehicle. Plaintiffs walked the dealership in search of a vehicle to meet Plaintiffs' needs, assisted by a salesperson. Plaintiffs were specifically searching for a Ford Focus vehicle with an automatic transmission for a smoother and more effortless drive. In searching the car inventory on the car lot, Plaintiffs reviewed the window stickers of multiple Ford Focus vehicles that caught their eye.  The window stickers on these vehicles identified them as having an automatic transmission. Plaintiffs identified a 2012 Ford Focus they were interested in purchasing. Plaintiffs' conversations with the salesperson, the window sticker on the vehicle, and a test drive of the vehicle all reinforced Plaintiffs' belief that the Vehicle was in fact equipped with an automatic transmission.  The salesperson never disclosed to Plaintiffs that the vehicle was not actually equipped with an automatic transmission.  Plaintiffs relied on the statements on the window sticker and marketing materials they had received about the Ford Focus.

72.     Prior to purchasing the Vehicle, Plaintiffs reviewed marketing brochures, viewed television commercials and/or heard radio commercials about the qualities of the Ford Focus. Plaintiffs also relied on Ford's reputation as an established and experienced auto manufacturer. Plaintiffs further relied on the statements made during the sales process by Ford's agents and within the marketing brochures provided by Ford. However, Ford and its authorized agents did not publicly or privately disclose to Plaintiffs any information about the Transmission Defect. These omissions were material to Plaintiffs' decision to purchase the Vehicle.  Had Ford and/or its authorized agents publicly or privately disclosed the Transmission Defect before Plaintiffs purchased the Vehicle, Plaintiffs would have been aware of such disclosures, and would not have purchased the Vehicle.

73.     On or around June 21, 2012, Plaintiffs delivered the Vehicle to Ken Grody Ford an authorized Ford repair facility for repair in response to a recall notice. The repair facility technicians reprogrammed the transmission control module ("TCM") and powertrain control module ("PCM") and installed a plug in connection with the passenger side wiper motor.  When the Vehicle was finally returned to Plaintiffs, the service technician represented to Plaintiffs that the Vehicle had

been repaired and was safe to drive. Plaintiffs reasonably relied on this representation by the service technician at the authorized Ford repair facility. All repairs were covered under Ford's written warranty.

74.     On or around January 2, 2013, Plaintiffs again delivered the Vehicle to an authorized Ford repair facility for repair with complaints that the vehicle's transmission was emitting strange like noises upon take off.  When the Vehicle was returned to Plaintiffs, the service technician represented to Plaintiffs that the Vehicle had been repaired and was safe to drive. Plaintiffs reasonably relied on this representation by the service technician at the authorized Ford repair facility. All repairs were covered under Ford's written warranty.

75.     On or around March 26, 2014, Plaintiffs once again delivered the Vehicle to an authorized Ford repair facility for repair. Plaintiffs complained about the transmissio clunking into gear upon acceleration. shuddering at every stop and during stop-and-go traffic, and that the RPMs get high on operation. The repair facility technicians performed TSB 140047A. When the Vehicle was returned to Plaintiffs the service technician represented to Plaintiffs that the Vehicle was safe to drive. Plaintiffs reasonably relied on this representation by the service technician at the authorized Ford repair facility. All repairs were covered under Ford's written warranty.

76.     On or around July 7, 2015, Plaintiffs once again delivered the Vehicle to an authorized Ford repair facility for repair. Plaintiffs complained about the transmission freezing in gear and unable to shift. The repair facility technicians performed recall number 14M01L, reprogrammed TCM and ordered a clutch. When the vehicle was returned to Plaintiffs the service technician represented to Plaintiffs that the Vehicle was safe to drive. Plaintiffs reasonably relied on this representation by the service technician at the authorized Ford repair facility.  All repairs were covered under Ford's written warranty.

77.     On or around September 14, 2015, Plaintiffs once again delivered the Vehicle to an authorized Ford repair facility for repair. Plaintiffs complained about transmission freezing and the vehicle had to be towed in. The repair technicians reprogrammed the PCM and TCM, performed clutch adaptive learning procedure, replaced the clutch and both input shaft seals, cleaned the bell house, installed both inner seals, replaced the battery, and replaced the vehicle's vent. When the

Cordaro v. Ford - COMPLAINT

vehicle was returned to Plaintiffs, the service technician represented to Plaintiffs that the Vehicle was safe to drive. Plaintiffs reasonably relied on this representation by the service technician at the authorized Ford repair facility. All repairs were covered under Ford's written warranty.

78.     On or around October 26, 2015, Plaintiffs once again delivered the Vehicle to an authorized Ford repair facility for repair. Plaintiffs complained that the vehicle was driving in a rough manner.  The repair technicians removed the starter and retorqued the clutch to flwywheel nuts. When the vehicle was returned to Plaintiffs, the service technician represented to Plaintiffs that the Vehicle was safe to drive. Plaintiffs reasonably relied on this representation by the service technician at the authorized Ford repair facility.  All repairs were covered under Ford's written warranty.

### All Statute of Limitations Periods are Tolled by the Discovery Rule and the Doctrine of Fraudulent Concealment

79.     Ford misrepresented the qualities of the transmission in the Vehicle to Plaintiffs at the time of the sale of the vehicle.  Ford also concealed the fact that the transmission was defective.

80.     Ford continued to misrepresent its ability to repair the vehicle in conformity with the warranty throughout the warranty period.

81.     At all relevant times, Ford was aware of the defects in the Powershift transmission.

82.     As described in more detail above, as early as 2010, Ford began issuing significant technical service bulletins to its authorized dealers explaining the widespread issues with the Powershift transmission. At no point prior to the sale of the vehicle to Plaintiffs or during Plaintiffs' ownership of the Vehicle did Ford or an authorized dealer ever inform Plaintiffs of the ongoing defect or the fact that Plaintiffs' Vehicle was not actually equipped with an automatic transmission.

83.     Ford had a duty to disclose the concealed facts alleged above because Ford knew that Plaintiffs did not know a material fact and further knew that such facts were not readily accessible to the Plaintiffs because Ford actively concealed those facts.

84.     Ford had a duty to disclose the concealed facts alleged above because Ford made misrepresentations in its marketing materials and window stickers and through its authorized sales representatives about the quality, characteristics, and safety of the Powershift transmission.

85.     Ford had a duty to disclose the concealed facts alleged above because Ford actively concealed material facts in order to induce a false belief.

86.     Ford intended for Plaintiffs to rely on those misrepresentations to conceal the fact that the defective Powershift Transmission could not be repaired.

87.     Prior to the sale of the Vehicle, and at all times thereafter, Defendant therefore failed to disclose the existence of the vehicle's inherent defects to Plaintiffs, and Defendant failed to disclose its inability to repair these inherent defects, which prevented the Vehicle from conforming to its applicable warranties. In effect, after the sale of the Vehicle, Defendant fraudulently concealed from purchasers, including Plaintiffs, the fact that the dealers were not properly repairing the defects to the Powershift transmission, and knew that the limited work that Ford had authorized its dealerships to perform on those vehicles would not properly repair them. Ford also continued to conceal the fact that Plaintiffs' vehicle was not in fact equipped with an automatic transmission as advertised.

88.     On July 7, 2017, Defendant mailed Plaintiffs class notice as a putative class member in the class action, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx). Plaintiffs received this notice shortly thereafter. This date was the earliest date that Plaintiffs could have had any sort of notice of the facts which give rise to Plaintiffs' fraud causes of action. Ford did not disclose any of this information prior to the sale of the vehicle to Plaintiffs or at any earlier date during ownership. Accordingly, Plaintiffs could not have discovered their claims prior to July 7, 2017. Plaintiffs could not, despite reasonable and diligent investigation, have discovered such on an earlier date because of Ford's fraudulent misrepresentations and concealment of the defects in the PowerShift transmission in Plaintiffs' vehicle, as previously alleged above. Additionally, the repeated false assurances of Ford and its service dealership agents made to Plaintiffs, on which Plaintiffs reasonably relied, that Ford had and would repair any problems with the transmission in Plaintiffs' vehicle that occurred during the express warranty period and that said problems would not be repeating further delayed Plaintiffs' discovery of his claims.  The statute of limitations for each of Plaintiffs' claims against Ford was therefore tolled under the delayed discovery rule and the doctrine of fraudulent concealment until Plaintiff could have first discovered on or around July 7, 2017, that Ford had misrepresented the

1 | characteristics of the transmission and concealed the known defects during the ownership of the

2 | Vehicle.

3 |     89.    Because Ford failed to disclose these foregoing facts to Plaintiffs, all statute of limitations

4 | periods with respect to sale of the Vehicle were tolled by the doctrines of fraudulent concealment,

5 | the discovery rule, and/or equitable tolling.  As alleged herein, Ford wrongfully concealed the fact

6 | (1) that the Vehicle was equipped with a manual transmission (the PowerShift transmission), and (2)

7 | that its dealerships were making inadequate repairs that were incapable of addressing the root cause

8 | of the Vehicle's malfunctions.

9 |     90.    Plaintiffs did not discover the operative facts that are the basis of the claims alleged herein

10 | because the facts were concealed in confidential and privileged documents, which a consumer would

11 | not know about and could not obtain.

12 |     91.    No amount of diligence by Plaintiffs could have led to the discovery of these facts

13 | because they were kept secret by Ford and, therefore, Plaintiffs were not at fault for failing to

14 | discover these facts.

15 |     92.    Plaintiffs did not have actual knowledge of facts sufficient to put them on notice.

16 | Plaintiffs did not know, nor could have known, about Ford's inability to repair the defects in its

17 | PowerShift transmission because, as alleged above, Ford kept this information highly confidential,

18 | and its dealership assured Plaintiffs that its repairs were effective.

19 | All Statute of Limitations Periods are Tolled by the Tolling Doctrine Established in *American Pipe*
20 | *& Construction Co. v. Utah* (1974) 414 U.S. 538 As a Result of the Class Action *Vargas v. Ford*
    *Motor Company*

21 |

22 |     93.    Plaintiffs gave timely notice of Plaintiffs' claims against Ford in the present action as

23 | putative class members in a class action, *Vargas v. Ford Motor Company*, United States District

24 | Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on

25 | September 28, 2012.

26 |     94.    There is no prejudice to Ford in gathering evidence to defend against Plaintiffs'

27 | individual claims because the class definition in the class action complaint within which Plaintiffs

28 | were putative class members and the allegations in the class action lawsuit, *Vargas v. Ford Motor*

1   *Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC

2   (FFMx), put Ford on notice of the facts that give rise to Plaintiffs' individual action, the witnesses

3   necessary for Ford to defend Plaintiffs' individual action, and the causes of action against Ford

4   asserted in Plaintiffs' individual action.

5      95.   *Vargas v. Ford Motor Company*, United States District Court, Central District of

6   California, Case No. 2:12-cv-08388 ABC (FFMx) alleged the material facts on behalf of Plaintiffs

7   as putative class members as are being alleged by Plaintiffs in the present individual action.

8      96.   The facts alleged in *Vargas v. Ford Motor Company*, United States District Court,

9   Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are substantially similar, if not

10   identical to the facts alleged herein.

11      97.   The allegations in *Vargas v. Ford Motor Company*, United States District Court, Central

12   District of California, Case No. 2:12-cv-08388 ABC (FFMx) are based on the same subject matter

13   and similar evidence as the instant complaint.   Those allegations concern the same evidence,

14   memories, and witnesses as the subject matter in the instant complaint.

15      98.   The *Vargas* class action certainly protected the efficiency and economy of litigation

16   because that class action is protecting the rights of thousands of consumers nationwide through a

17   single action.   Consumer class actions regarding defective vehicles brought against manufacturers

18   are regularly certified, making a class action lawsuit an efficient means of pursuing such claims.

19      99.   The tolling of Plaintiffs' individual statute of limitations encourages the protection of

20   efficiency and economy in litigation as promoted by the class action devise, so that putative class

21   members would not find it necessary to seek to intervene or to join individually because of fear the

22   class might never be certified or putative class members may subsequently seek to request exclusion.

23      100   The running of all statute of limitations on each of Plaintiffs' claims asserted against Ford

24   in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of

25   the *Vargas* class action (i.e., from the date on which the *Vargas* class action was filed on September

26   28, 2012 to the date on which Plaintiffs opted out of the class action, on or about August 31, 2017).

27   ///

28   ///

-19-

**All Statute of Limitations Periods are Tolled Under California Law by the Doctrine of Equitable
Tolling As a Result of the Class Action *Vargas v. Ford Motor Company***

101.     Plaintiffs gave timely notice of Plaintiffs' claims against Ford in the present action as putative class members in a class action, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on September 28, 2012.

102.     There is no prejudice to Ford in gathering evidence to defend against Plaintiffs' individual claims because the class definition in the class action complaint within which Plaintiffs were putative class members and the allegations in the class action lawsuit, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), put Ford on notice of the facts that give rise to Plaintiffs' individual action, the witnesses necessary for Ford to defend Plaintiffs' individual action, and the causes of action against Ford asserted in Plaintiffs' individual action.

103.     *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) alleged the material facts on behalf of Plaintiffs as putative class members as are being alleged by Plaintiffs in the present individual action.

104.     The facts alleged in *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are substantially similar, if not identical to the facts alleged herein.

105.     The allegations in *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are based on the same subject matter and similar evidence as the instant complaint. Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

106.     The *Vargas* class action certainly protected the efficiency and economy of litigation because that class action is protecting the rights of thousands of consumers nationwide through a single action. Consumer class actions regarding defective vehicles brought against manufacturers are regularly certified, making a class action lawsuit an efficient means of pursuing such claims.

///

107.   Plaintiffs acted reasonably and in good faith in filing the instant action.  Shortly after discovering Ford's fraudulent behavior, Plaintiffs filed the instant action to pursue their individual rights without delay.

108.   The tolling of Plaintiffs' individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action devise, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

109.   The running of all statute of limitations on each of Plaintiffs' claims asserted against Ford in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the *Vargas* class action (i.e., from the date on which the *Vargas* class action was filed on September 28, 2012 to the date on which Plaintiffs opted out of the class action, on or about August 31, 2017).

## FIRST CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Express Warranty

110.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

111.   Express warranties accompanied the sale of the vehicle to Plaintiffs by which Ford undertook to preserve or maintain the utility or performance of Plaintiffs' vehicle or provide compensation if there was a failure in such utility or performance.

112.   The vehicle was delivered to Plaintiffs with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty including, but not limited to a transmission.

113.   Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil Code sections 1790 *et seq.* the vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiffs have used the vehicle primarily for those purposes.

114.   Plaintiffs are a "buyer" of consumer goods under the Act.

115.   Defendant Ford is a "manufacturer" and/or "distributor" under the Act.

///

1    116.    The foregoing defects and nonconformities to warranty manifested themselves within the

2    applicable express warranty period. The nonconformities substantially impair the use, value and/or

3    safety of the vehicle.

4    117.    Plaintiffs delivered the vehicle to an authorized Ford repair facility for repair of the

5    nonconformities.

6    118.    Defendant was unable to conform Plaintiffs' vehicle to the applicable express warranty

7    after a reasonable number of repair attempts.

8    119.    Notwithstanding Plaintiffs' entitlement, Defendant Ford has failed to either promptly

9    replace the new motor vehicle or promptly make restitution in accordance with the Song-Beverly

10    Act.

11    120.    By failure of Defendant to remedy the defects as alleged above, or to issue a refund or

12    replacement, Defendant is in breach of its obligations under the Song-Beverly Act.

13    121.    Under the Act, Plaintiffs are entitled to reimbursement of the price paid for the vehicle

14    less that amount directly attributable to use by the Plaintiffs prior to discovery of the

15    nonconformities.

16    122.    Plaintiffs are entitled to all incidental, consequential, and general damages resulting from

17    Defendant's failure to comply with their obligations under the Song-Beverly Act.

18    123.    Plaintiffs are entitled under the Song-Beverly Act to recover as part of the judgment a

19    sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably

20    incurred in connection with the commencement and prosecution of this action.

21    124.    Plaintiffs are entitled in addition to the amounts recovered, a civil penalty of up to two

22    times the amount of actual damages in that Ford, has willfully failed to comply with its

23    responsibilities under the Act.

24    **SECOND CAUSE OF ACTION**

25    **Violation of the Song-Beverly Act – Breach of Implied Warranty**

26    125.    Plaintiffs incorporate herein by reference each and every allegation contained in the

27    preceding and succeeding paragraphs as though herein fully restated and re-alleged.

28    ///

1    126.   Ford and its authorized dealership at which Plaintiffs purchased the Subject Vehicle had

2    reason to know the purpose of the Subject Vehicle at the time of sale of the Subject Vehicle.  The

3    sale of the Subject Vehicle was accompanied by an implied warranty of fitness.

4    127.   The sale of the Subject Vehicle was accompanied by an implied warranty that the Subject

5    Vehicle was merchantable pursuant to Civil Code section 1792.

6    128.   The Subject Vehicle was not of the same quality as those generally acceptable in the trade

7    because it was equipped with a defective transmission.

8    129.   The Subject Vehicle was not fit for the ordinary purpose for which such goods are used

9    because it was equipped with a defective transmission.

10    130.   The Subject Vehicle did not measure up to the promises or facts stated on the container

11    or label because it was equipped with a defective transmission.

12    131.   The Subject Vehicle did not measure up to the promises or facts stated on the container

13    or label because it was equipped with an automated manual transmission rather than the automatic

14    transmission as labeled.

15    132.   Plaintiffs are entitled to justifiably revoke acceptance of the Subject Vehicle under Civil

16    Code section 1794, *et seq*; Plaintiffs hereby revoke acceptance of the Subject Vehicle.

17    133.   Plaintiffs are entitled to replacement or reimbursement pursuant to Civil Code section

18    1794, *et seq.*

19    134.   Plaintiffs are entitled to rescission of the contract pursuant to Civil Code section 1794, *et*

20    *seq.* and Commercial Code section 2711.

21    135.   Plaintiffs are entitled to recover any "cover" damages under Commercial Code sections

22    2711, 2712, and Civil Code section 1794, *et seq.*

23    136.   Plaintiffs are entitled to recover all incidental and consequential damages pursuant to

24    1794 *et seq* and Commercial Code sections 2711, 2712, and 2713 *et seq.*

25    ///

26    ///

27    ///

28    ///

-23-

Cordaro v. Ford - COMPLAINT

### THIRD CAUSE OF ACTION

#### Fraudulent Inducement – Concealment

#### (Against Defendant FORD Only)

137.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

138.   Ford and its agents intentionally concealed and failed to disclose facts relating to the Transmission Defects as explained in detail in paragraphs 13-69.

139.   Defendant was the only party with knowledge of the Transmission Defects because that knowledge came from internal reports such as pre-release testing data, customer complaints made directly to Defendant, and technical service bulletins. None of this information was available to the public, nor did Defendant publicly or privately disclose any of the information to Plaintiffs. Ford had exclusive knowledge of the defect as described in detail in paragraphs 45-52.

140.   Ford actively concealed information from the public, preventing Plaintiffs from discovering any of the concealed facts as described in detail in paragraphs 53-69.

141.   Prior to the date of sale, on the date of sale, and on the date of each of the repair attempts, Defendant had an opportunity to disclose to Plaintiffs, but instead concealed from and failed to disclose to Plaintiffs, any of the known irreparable issues with the Vehicle.

142.   Ford intended to deceive Plaintiffs by concealing the known issues with the PowerShift Transmission, including the Transmission Defect, in an effort to sell the Vehicle at a maximum price.

143.   Ford knew of the specific transmission issues affecting the Vehicle, including the Transmission Defect, prior to the sale of the Vehicle. For example, in 2010, Ford released a TSB after months of research relating to "concerns such as no engage or intermittent no engage in Drive or Reverse when shifting from Park to Drive or Reverse" for certain vehicles equipped with the PowerShift Transmission. Plaintiffs vehicle was sold after Ford acknowledged these problems in a TSB without any sort of disclosure being made to the Plaintiffs. When Plaintiffs experienced repeated problems with the shifting of the transmission in the Vehicle, and at each time Plaintiffs brought the Vehicle to Ford's authorized repair facility for evaluation and repair, Ford and its agents
///

1   continued to conceal the known Transmission Defect and repeatedly represented to Plaintiffs that it
2   was able to fix the issue.

3   144.   Plaintiffs did not know about the Transmission Defects at the time of sale.  Plaintiffs also
4   did not know of the irreparable nature of the problems at the time of any of the repair attempts
5   because Ford and its agents repeatedly represented that it was able to fix the vehicle upon return of
6   the Vehicle to Plaintiffs.

7   145.   Had Ford and/or its agents publicly or privately disclosed the Transmission Defect to
8   Plaintiffs at or prior to the sale, Plaintiffs would not have purchased the Vehicle.

9   146.   Plaintiffs were harmed by Defendant's concealment of the Transmission Defect because
10  Plaintiffs were induced to enter into the sale of a vehicle that Plaintiffs would not have otherwise
11  purchased.

12  147.   Defendant's concealment of the defects was a substantial factor in causing Plaintiffs'
13  harm.

14  ## FOURTH CAUSE OF ACTION

15  **Fraudulent Inducement – Intentional Misrepresentation**

16  **(Against Defendant FORD Only)**

17  148.   Plaintiffs incorporate herein by reference each and every allegation contained in the
18  preceding and succeeding paragraphs as though herein fully restated and re-alleged.

19  149.   Ford drafted, produced, and distributed marketing brochures to the public containing
20  factual representations about the PowerShift Transmission.  Ford's marketing brochure for the
21  Vehicle represented the PowerShift Transmission had the following qualities:

22          a.   "With... PowerShift 6-speed transmission in Focus, you get the performance of a
23               manual. From an automatic. It delivers seamless gear changes for amazing
                 responsiveness."

24  150.   Unfortunately, the Vehicle as delivered to Plaintiffs had extremely poor handling on all
25  roads, as Plaintiffs' drive was repeatedly interrupted by jerky shifts and hesitation.  Plaintiffs'
26  Vehicle was also not equipped with an "automatic" transmission, contrary to Ford's suggestion that
27  the transmission is a traditional "automatic."  Plaintiffs' Vehicle in fact contained an unproven
28  automated dual clutch manual transmission. Plaintiffs' Vehicle did not have seamless gear changes

-25-

Cordaro v. Ford - COMPLAINT

1  – it experienced jerky gear changes and hesitation between shifts, which necessitated several repairs

2  and repeated reprogramming of the transmission control module – none of which were sufficient to

3  resolve the Transmission Defect.

4      151.   Ford made such representations regarding PowerShift Transmission in the 2012 Ford

5  Focus despite its extensive internal knowledge of the Transmission Defect and other problems.

6  Ford's knowledge of the Transmission Defect is laid out in detail in paragraphs 45-52.

7      152.   Ford informed its dealers and authorized service facilities and personnel, about common

8  behavior characteristics of the PowerShift Transmission in July 2011. In a memo with instructions

9  sent to Ford dealers and authorized service personnel, Ford noted that some of the common

10  characteristics of the PowerShift Transmission include double clicking metal sounds, coast down

11  whine, low speed grinding, and reverse gear whine. Despite this admission by Ford to its dealers,

12  repair facilities, and agents, Ford continued to represent to the public that the PowerShift

13  Transmission offered "great handling on all roads," and "the performance of a manual," and

14  seamless gear changes for amazing responsiveness," a wildly different picture from the reality. Ford

15  made the statements in its marketing brochures recklessly and without regard for their truth.

16      153.   In addition, Ford misrepresented the type of transmission equipped in the Vehicle.

17  Throughout its marketing brochure, Ford states that the vehicle is equipped with a 6 speed automatic

18  transmission. That representation is false. The vehicle is actually equipped with the Ford PowerShift

19  Transmission, which is in fact a dual clutch transmission, which operates using direct mechanical

20  engagement and disengagement similar to a manual transmission. This information is material for

21  a consumer to know in making a purchasing decision, because unlike a traditional automatic

22  transmission, Ford's PowerShift dual clutch transmission powers the drive wheels through a clutch,

23  rather than a torque converter. The use of a clutch can result in a substantially jerkier ride than that

24  produced using a torque converter, particularly in an unproven design. Plaintiffs would not have

25  purchased the Vehicle had Plaintiffs known the vehicle's transmission technology would cause the

26  drive to be jerky, unreliable, and dangerous as a result of the unproven dual-clutch (rather than

27  automatic) system.

28  ///

154.    Defendants intended that Plaintiffs rely on the representations made in the marketing brochure related to the transmission in inducing Plaintiffs to purchase the Vehicle.

155.    Plaintiffs reasonably relied on Defendant's representations related to the transmission being "automatic" and providing a smooth ride, because Ford was the manufacturer of the vehicle and claimed to have performed and relied upon extensive pre-release testing of the PowerShift Transmission. Ford was in a superior position of knowledge.

156.    Plaintiffs were harmed by purchasing a vehicle that Plaintiffs would not have purchased had they known the true facts about the transmission, and the Transmission Defects, affecting it.

157.    Plaintiffs' reliance on Defendants' representations about the transmission qualities was a substantial factor in Plaintiffs' harm, as Ford and its agents were the exclusive source of information about the qualities of the transmission.

## FIFTH CAUSE OF ACTION

### Fraudulent Inducement – Negligent Misrepresentation

### (Against Defendant FORD Only)

158.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

159.    At the time Ford made the misrepresentations identified in paragraph 13-69 above, they had no reasonable grounds for believing the representations to be true, because Ford was simultaneously issuing internal memoranda to its agents and dealerships about the characteristics of the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving." None of those characteristics can be reasonably construed to provide "great handling on all roads," "seamless gear changes," or "amazing responsiveness," as the PowerShift Transmission was described to the Plaintiffs in marketing materials. Ford's knowledge of the Transmission Defect is outlined in more detail in paragraphs 45-52.

///

///

///

///

-27-
Cordaro v. Ford - COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, as follows:

    a.  For general, special and actual damages according to proof at trial;

    b.  For rescission of the purchase contract and restitution of all monies expended;

    c.  For diminution in value;

    d.  For incidental and consequential damages according to proof at trial;

    e.  For civil penalty in the amount of two times Plaintiffs' actual damages;

    f.  For prejudgment interest at the legal rate;

    g.  For punitive damages pursuant to Civil Code section 3294; As to Ford only

    h.  For reasonable attorney fees and costs of suit; and

    i.  For such other relief as the Court deems just and proper under the circumstances.

Dated: 7/13/18

                            KNIGHT LAW GROUP, LLP

                            Steve Mikhov (SBN 224676)
                            Amy Morse (SBN 290502)
                            Attorneys for Plaintiffs,
                            JULIE DAWN CORDARO and
                            JENNIFER A. CORDARO

       Plaintiffs JULIE DAWN CORDARO and JENNIFER A. CORDARO hereby demand trial by jury in this action.

-28-

Cordaro v. Ford - COMPLAINT

# EXHIBIT 1

**Object 00691FVG (Page 3 of 143)**



ORIGINAL LIENHOLDER

Object 00691FVG (Page 4 of 143)



NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

CM-010

| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):* | **FOR COURT USE ONLY** |
|---|---|
| Steve Mikhov (SBN 224676)/Amy Morse (SBN 290502)<br>Knight Law Group, LLP<br>10250 Constellation Blvd., Suite 2500, Los Angeles, CA 90067<br>TELEPHONE NO.: (310) 552-2250   FAX NO.: (310) 552-7973<br>ATTORNEY FOR *(Name):* JULIE DAWN CORDARO and JENNIFER A. CORDARO | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**07/16/2018** at 11:08:57 AM<br><br>Clerk of the Superior Court<br>By Yvette Mapula, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS: 330 West Broadway
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: Hall of Justice Courthouse

CASE NAME:
JULIE DAWN CORDARO and JENNIFER A. CORDARO v. FORD MOTOR COMPANY, a Delaware Corporation, et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | **CASE NUMBER:** |
|---|---|---|
| ☒ Unlimited   ☐ Limited<br>(Amount         (Amount<br>demanded      demanded is<br>exceeds $25,000)  $25,000 or less) | ☐ Counter   ☐ Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 37-2018-00035179-CU-BC-CTL<br><br>JUDGE: Judge Timothy Taylor<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation**<br>**(Cal. Rules of Court, rules 3.400–3.403)** |
|---|---|---|
| ☐ Auto (22) | ☒ Breach of contract/warranty (06) | ☐ Antitrust/Trade regulation (03) |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property** | ☐ Other collections (09) | ☐ Mass tort (40) |
| **Damage/Wrongful Death) Tort** | ☐ Insurance coverage (18) | ☐ Securities litigation (28) |
| ☐ Asbestos (04) | ☐ Other contract (37) | ☐ Environmental/Toxic tort (30) |
| ☐ Product liability (24) | **Real Property** | ☐ Insurance coverage claims arising from the |
| ☐ Medical malpractice (45) | ☐ Eminent domain/Inverse | above listed provisionally complex case |
| ☐ Other PI/PD/WD (23) | condemnation (14) | types (41) |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | **Enforcement of Judgment** |
| ☐ Business tort/unfair business practice (07) | ☐ Other real property (26) | ☐ Enforcement of judgment (20) |
| ☐ Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| ☐ Defamation (13) | ☐ Commercial (31) | ☐ RICO (27) |
| ☐ Fraud (16) | ☐ Residential (32) | ☐ Other complaint *(not specified above)* (42) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | **Miscellaneous Civil Petition** |
| ☐ Professional negligence (25) | **Judicial Review** | ☐ Partnership and corporate governance (21) |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Other petition *(not specified above)* (43) |
| **Employment** | ☐ Petition re: arbitration award (11) | |
| ☐ Wrongful termination (36) | ☐ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties    d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel    e. ☐ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve       in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence     f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☒ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☒ punitive
4. Number of causes of action *(specify):* 5
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 7/13/18

Steve Mikhov
_____
(TYPE OR PRINT NAME)                                           (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |
|---|---|---|

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
   Damage/Wrongful Death
Uninsured Motorist (46) (*if the
   case involves an uninsured
   motorist claim subject to
   arbitration, check this item
   instead of Auto*)

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/
      Wrongful Death
Product Liability (*not asbestos or
   toxic/environmental*) (24)
Medical Malpractice (45)
   Medical Malpractice–
      Physicians & Surgeons
   Other Professional Health Care
      Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip
      and fall)
   Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
   Intentional Infliction of
      Emotional Distress
   Negligent Infliction of
      Emotional Distress
   Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
   Practice (07)
Civil Rights (e.g., discrimination,
   false arrest) (*not civil
   harassment*) (08)
Defamation (e.g., slander, libel)
   (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice
      (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease
      Contract (*not unlawful detainer
      or wrongful eviction*)
   Contract/Warranty Breach–Seller
      Plaintiff (*not fraud or negligence*)
   Negligent Breach of Contract/
      Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open
   book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections
      Case
Insurance Coverage (*not provisionally
   complex*) (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
   Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property (*not eminent
   domain, landlord/tenant, or
   foreclosure*)
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal
   drugs, check this item; otherwise,
   report as Commercial or Residential*)
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court
      Case Matter
   Writ–Other Limited Court Case
      Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
   (*arising from provisionally complex
   case type listed above*) (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of
      County)
   Confession of Judgment (*non-
   domestic relations*)
   Sister State Judgment
   Administrative Agency Award
      (*not unpaid taxes*)
   Petition/Certification of Entry of
      Judgment on Unpaid Taxes
   Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified
   above*) (42)
   Declaratory Relief Only
   Injunctive Relief Only (*non-
   harassment*)
   Mechanics Lien
   Other Commercial Complaint
      Case (*non-tort/non-complex*)
   Other Civil Complaint
      (*non-tort/non-complex*)
**Miscellaneous Civil Petition**
Partnership and Corporate
   Governance (21)
Other Petition (*not specified
   above*) (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult
      Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late
      Claim
   Other Civil Petition

**CIVIL CASE COVER SHEET**

1

**KNIGHT LAW GROUP, LLP**

2   Steve Mikhov (SBN 224676)
stevem@knightlaw.com

3   Amy Morse (SBN 290502)
amym@knightlaw.com

4   10250 Constellation Blvd., Suite 2500
Los Angeles, CA 90067

5   Telephone: (310) 552-2250

6   Fax: (310) 552-7973

7   Attorneys for Plaintiffs,

8   JULIE DAWN CORDARO and
JENNIFER A. CORDARO

9

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**07/16/2018** at 11:08:57 AM

Clerk of the Superior Court
By Yvette Mapula, Deputy Clerk

10              **SUPERIOR COURT OF CALIFORNIA**

11                  **COUNTY OF SAN DIEGO**

| | |
|---|---|
| 12  **JULIE DAWN CORDARO and** <br> **JENNIFER A. CORDARO,** | Case No.: **37-2018-00035179-CU-BC-CTL** |
| 13 | Unlimited Jurisdiction |
| 14              Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| 15 | |
| 16          vs. | *Assigned for All Purposes to the* <br> *Honorable* |
| 17 | |
| 18  **FORD MOTOR COMPANY, a Delaware** <br> **Corporation; VINCE DIXON FORD, INC., a** | Department |
| 19  **California Corporation, dba KEN GRODY** <br> **FORD; and DOES 1 through 10, inclusive,** | |
| 20 | |
| 21              Defendants. | |
| 22 | |

23

24

25

26

27

28

-1-

**DEMAND FOR JURY TRIAL**

1

## DEMAND FOR JURY TRIAL

2      Plaintiffs, JULIE DAWN CORDARO and JENNIFER A. CORDARO, hereby demand trial

3  by jury in this action.

4

5  Dated: 7/13/18

KNIGHT LAW GROUP, LLP

6

7

8

Steve Mikhov (SBN 224676)

9  Amy Morse (SBN 290502)

Attorney for Plaintiffs,

10  JULIE DAWN CORDARO and

JENNIFER A. CORDARO

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-
## DEMAND FOR JURY TRIAL

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS: 330 W Broadway
MAILING ADDRESS: 330 W Broadway
CITY AND ZIP CODE: San Diego, CA 92101-3827
BRANCH NAME: Central
TELEPHONE NUMBER: (619) 450-7072

PLAINTIFF(S) / PETITIONER(S): Julie Dawn Cordaro et.al.

DEFENDANT(S) / RESPONDENT(S): Ford Motor Company et.al.

CORDARO VS FORD MOTOR COMPANY [IMAGED]

| NOTICE OF CASE ASSIGNMENT and CASE MANAGEMENT CONFERENCE | CASE NUMBER:<br>37-2018-00035179-CU-BC-CTL |
|---|---|

## CASE ASSIGNMENT

Judge: Timothy Taylor                                            Department: C-72

### COMPLAINT/PETITION FILED: 07/16/2018

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 12/21/2018 | 09:45 am | C-72 | Timothy Taylor |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS: The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS: Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE: Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES: In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

COURT REPORTERS: Court reporters are not provided by the Court in Civil cases. See policy regarding normal availability and unavailability of official court reporters at www.sdcourt.ca.gov.

*ALTERNATIVE DISPUTE RESOLUTION (ADR): THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).



# Superior Court of California
# County of San Diego

# NOTICE OF ELIGIBILITY TO eFILE
# AND ASSIGNMENT TO IMAGING DEPARTMENT

This case is eligible for eFiling. Should you prefer to electronically file documents, refer to General Order in re procedures regarding electronically imaged court records, electronic filing, and access to electronic court records in civil and probate cases for rules and procedures or contact the Court's eFiling vendor at www.onelegal.com for information.

This case has been assigned to an Imaging Department and original documents attached to pleadings filed with the court will be imaged and destroyed. Original documents should not be filed with pleadings. If necessary, they should be lodged with the court under California Rules of Court, rule 3.1302(b).

On August 1, 2011 the San Diego Superior Court began the Electronic Filing and Imaging Pilot Program ("Program"). As of August 1, 2011 in all new cases assigned to an Imaging Department all filings will be imaged electronically and the electronic version of the document will be the official court file. The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and on the Internet through the court's website.

You should be aware that the electronic copy of the filed document(s) will be the official court record pursuant to Government Code section 68150. The paper filing will be imaged and held for 30 days. After that time it will be destroyed and recycled. **Thus, you should not attach any original documents to pleadings filed with the San Diego Superior Court. Original documents filed with the court will be imaged and destroyed except those documents specified in California Rules of Court, rule 3.1806.** Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b)

It is the duty of each plaintiff, cross-complainant or petitioner to serve a copy of this notice with the complaint, cross-complaint or petition on all parties in the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words **"IMAGED FILE"** in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.



# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

**CASE NUMBER:** 37-2018-00035179-CU-BC-CTL    **CASE TITLE:** Cordaro vs Ford Motor Company [IMAGED]

**NOTICE:** All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:

> **(1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),**
> **(2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), _and_**
> **(3) the Notice of Case Assignment form (SDSC form #CIV-721).**

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

### Potential Advantages and Disadvantages of ADR
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| Potential Advantages | Potential Disadvantages |
|---|---|
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | |
| • Gives parties more control over the dispute resolution process and outcome | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Preserves or improves relationships | |

### Most Common Types of ADR
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection: Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005). The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at www.courtinfo.ca.gov/selfhelp/lowcost.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS:        330 West Broadway | |
| MAILING ADDRESS:    330 West Broadway | |
| CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827 | |
| BRANCH NAME:           Central | |

| PLAINTIFF(S):    Julie Dawn Cordaro et.al. |
|---|
| DEFENDANT(S): Ford Motor Company et.al. |
| SHORT TITLE:    CORDARO VS FORD MOTOR COMPANY [IMAGED] |

| STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER:<br>37-2018-00035179-CU-BC-CTL |
|---|---|

Judge: Timothy Taylor                                         Department: C-72

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process.  Selection of any of these options will not delay any case management timelines.

☐   Mediation (court-connected)            ☐  Non-binding private arbitration

☐   Mediation (private)                          ☐  Binding private arbitration

☐   Voluntary settlement conference (private)      ☐  Non-binding judicial arbitration (discovery until 15 days before trial)

☐   Neutral evaluation (private)              ☐  Non-binding judicial arbitration (discovery until 30 days before trial)

☐   Other (specify e.g., private mini-trial, private judge, etc.): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name)  _____

_____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____                    Date: _____

_____                  _____
Name of Plaintiff                                          Name of Defendant

_____                  _____
Signature                                                 Signature

_____                  _____
Name of Plaintiff's Attorney                              Name of Defendant's Attorney

_____                  _____
Signature                                                 Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385.  Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

IT IS SO ORDERED.

Dated:  07/17/2018                                        _____
                                                         JUDGE OF THE SUPERIOR COURT

SDSC CIV-359 (Rev 12-10)            **STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION**            Page: 1